## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| HARVEST FAMILY CHURCH, HI-WAY TABERNACLE, and ROCKPORT FIRST ASSEMBLY OF GOD, <br><br> *Plaintiffs*, <br><br> v. <br><br> FEDERAL EMERGENCY MANAGEMENT AGENCY, WILLIAM B. LONG, Administrator of the Federal Emergency Management Agency, <br><br> *Defendants*. | No. 4:17-cv-2662 <br><br><br> **Jury Demanded** |

## FIRST AMENDED COMPLAINT

Come now Plaintiffs Harvest Family Church, Hi-Way Tabernacle, and Rockport First Assembly of God (the "Churches"), by and through their attorneys, and state as follows for their first amended complaint:

## NATURE OF THE ACTION

1.     This is a challenge to the policy of the Federal Emergency Management Agency ("FEMA") that excludes houses of worship from equal access to disaster-relief grants because of their religious status. The policy violates the Free Exercise Clause of the First Amendment, including under *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017) and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).

2.   The people of Texas have just suffered one of the greatest natural disasters in U.S. history, with many dead, thousands displaced, and billions of dollars in damage. Millions of homes, businesses, government buildings, and places of worship have been heavily damaged or destroyed. Hurricane Harvey, like Hurricane Katrina before it, will have after-effects for decades to come.

3.   To its credit, the federal government has stepped in to help the people of Texas, who are already very busy helping one another with the recovery process. One of the leading resources for disaster relief has been houses of worship. Indeed, Plaintiff Hi-Way Tabernacle is currently in use as a shelter for dozens of evacuees, a warehouse for disaster relief supplies, a distribution center for thousands of emergency meals, and a base to provide medical services. FEMA has accordingly rightly recognized that houses of worship have an essential role as places of refuge during the storm, and as nerve centers of recovery afterwards.

4.   One would think, then, that houses of worship would also get federal government disaster-relief help on an equal basis with other private nonprofit societal institutions such as community centers and zoos. Yet FEMA policy explicitly denies equal access to FEMA disaster relief grants for houses of worship solely because of they are houses of *worship*—that is, because of their religious nature. If FEMA applies its policy to Hurricane Harvey, as it did to Superstorm Sandy and Hurricane Katrina, hundreds of churches, synagogues, and other houses of worship will be denied equal access to FEMA relief.

5.   The Constitution does not allow this exclusionary policy to continue. Under the Free Exercise Clause of the First Amendment—particularly as interpreted by the Supreme Court decision in *Trinity Lutheran Church*—government may not discriminate against a church, or a synagogue, or a mosque simply because of its *status* as a place of active religious teaching and worship.

6.   Plaintiff Churches—Harvest Family Church in Cypress, Hi-Way Tabernacle in Cleveland, and Rockport First Assembly of God in Rockport—ask this Court to order FEMA to treat them on equal terms with other non-profit organizations in accepting, processing, evaluating, and acting on their disaster relief applications. The churches are not seeking special treatment; they are seeking a fair shake. And they need to know now whether they have any hope of counting on FEMA or whether they will continue to be excluded entirely from these FEMA programs.

7.   Moreover, the Churches seek expedited relief for several reasons. First, their houses of worship are heavily damaged right now and they need to make time-sensitive decisions right now about how to rebuild. It is for this reason that FEMA policy emphasizes that effective disaster relief requires coordination with FEMA as soon as possible after a disaster. Second, FEMA relief grants for emergency protective measures are scheduled for a ten-percent cut 30 days after the President's Texas disaster declaration.

8.   This may be the first case this Court will hear regarding Hurricane Harvey disaster relief, but it is surely not the last. It is therefore imperative that the courts ensure that FEMA's aid is distributed in accordance with the Constitution.

## JURISDICTION AND VENUE

9.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1361. This action arises under the Constitution and laws of the United States. This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

10. Venue lies in this district pursuant to 28 U.S.C. § 1391(e). A substantial part of the events or omissions giving rise to the claim occurred in this district, and Plaintiffs Harvest Family Church and Rockport First Assembly of God are located in this district.

## IDENTIFICATION OF PARTIES

11. Harvest Family Church is located in Cypress, Texas, a town within Harris County.

12. Hi-Way Tabernacle is located in Cleveland, Texas, a town within Liberty County.

13. Rockport First Assembly of God is located in Rockport, Texas, a town within Aransas County.

14. Defendants are appointed officials of the United States government and United States governmental agencies responsible for creating and enforcing the challenged policy.

15. Defendant William B. Long is the Administrator of FEMA. In this capacity, he has responsibility for the operation and management of FEMA. Administrator Long is sued in his official capacity only.

4

16. Defendant Federal Emergency Management Agency is an executive agency of the United States government housed within the Department of Homeland Security and is responsible for the promulgation, administration, and enforcement of the challenged policies.

## FACTUAL ALLEGATIONS

### I.   The Churches

17. Harvest Family Church is a young church. It started in 2011 with just 20 members and today has about 200 members from diverse backgrounds.

18. Hi-Way Tabernacle has been operating for over 15 years and has a congregation of about 300 members.

19. Rockport First Assembly of God has grown in recent years from about 25 members to about 125 members today.

20. Each of the Churches are open to the public, are involved in their communities, and perform a number of public services.

### II.   FEMA's Public Assistance Program

21. The Robert T. Stafford Disaster Relief and Emergency Assistance Act authorizes "[t]he President" to "make contributions" to the owner or operator of "a private nonprofit facility damaged or destroyed by a major disaster for the repair, restoration, reconstruction, or replacement of the facility and for associated expenses." 42 U.S.C. § 5172(a)(1)(B).

22. To trigger the availability of federal assistance, the President must first declare that a major disaster exists in a State. FEMA then administers federal

5

financial assistance in that State through its Public Assistance Program ("PA Program") in accordance with FEMA regulations and FEMA policies contained in FEMA's Public Assistance Program and Policy Guide, https://www.fema.gov/media-library-data/1496435662672-d79ba9e1edb16e60b51634af00f490ae/2017_PAPPG_2.0_508_FINAL(2).pdf ("FEMA Policy Guide").

23. The PA Program is FEMA's largest grant program under the Stafford Act. Its purpose is to assist communities responding to and recovering from major disasters or emergencies declared by the President. The program provides emergency assistance to save lives and protect property, and assists with permanently restoring community infrastructure affected by a federally declared incident.

24. As relevant here, to be eligible for the disaster aid under the PA Program, a private nonprofit organization "must show that it has [a] current letter ruling from the U.S. Internal Revenue Service granting tax exemption under sections 501(c), (d), or (e) of the Internal Revenue Code of 1954" and the organization must "own[] or operate[] an eligible facility." FEMA Policy Guide at 12-13, 17 (citing 44 C.F.R. § 206.221(f)).

25. An "eligible facility" is either (1) "A facility that provides a critical service, which is defined as education, utility, emergency, or medical," or (2) "A facility that provides non-critical, but essential governmental services AND is open to the general public." *Id.* at 12.

6

26. Eligible "non-critical" services include "museums, zoos, community centers, libraries, homeless shelters, senior citizen centers, rehabilitation facilities, shelter workshops and facilities which provide health and safety services of a governmental nature." 44 C.F.R. § 206.220(e)(7).

27. For "mixed-use facilities" "that provide both eligible and ineligible services," eligibility "is dependent on the *primary* use of the facility," which means "*more* than 50 percent of the physical space in the facility is dedicated" to eligible services. FEMA Policy Guide at 17. "In cases where the same physical space is used for both eligible and ineligible services, the primary use is the use for which more than 50 percent of the operating time is dedicated in that shared physical space." *Id.*

28. "If FEMA determines that 50 percent or more of physical space is dedicated to ineligible services, the entire facility is ineligible. If the facility is eligible, FEMA prorates funding based on the percentage of physical space dedicated to eligible services." *Id.* at 17.

29. For eligible facilities, the PA Program provides funds for both "Emergency Work" and "Permanent Work." *Id.* at 20.

30. Emergency Work is "that which must be done immediately to: Save Lives; Protect public health and safety; Protect improved property; or Eliminate or lessen an immediate threat of additional damage." *Id.* at 43. Emergency work is divided into two categories: (A) "debris removal" and (B) "emergency protective measures." *Id.* Debris removal may also be authorized "to ensure economic recovery of the affected community." *Id.* at 44.

7

31. Permanent work "is work required to restore a facility to its pre-disaster design (size and capacity) and function in accordance with applicable codes and standards." *Id.* at 20.

32. To qualify for the PA Program, repair work must (1) "Be required as a result of the declared incident;" (2) "Be located within the designated area, with the exception of sheltering and evacuation activities;" and (3) "Be the legal responsibility of an eligible Applicant." *Id.* at 20.

33. Eligible private nonprofit facilities that provide eligible non-critical services must apply for a Small Business Administration ("SBA") disaster loan before seeking PA Program funds for Permanent Work. PA Program funds are available only for the portion of Permanent Work that an SBA loan does not cover, or if the SBA loan application is denied. However, nonprofits may seek and receive PA Program funds for Emergency Work regardless of whether they have applied for an SBA loan. *Id.* at 18.

34. Eligible facilities must ordinarily submit a Request for Public Assistance form to FEMA within 30 days of the President's disaster proclamation. *Id.* at 131. But on September 1, 2017, the President extended the deadline by 60 days, to November 22, 2017.

35. Despite the extension, FEMA policy emphasizes the "necessity to collaborate with Applicants early in the PA Program implementation process," preferably "as soon as possible" after a disaster declaration. *Id.* at 131.

8

### III.  FEMA's discrimination against houses of worship

36. A broad range of nonprofit facilities are eligible for the PA Program. FEMA's definition of eligible "community centers" is particularly expansive.

37. The types of eligible activities include:

- "art services" including "arts administration, art classes, [and] management of public arts festivals";
- "educational enrichment activities" such as "car care, ceramics, gardening, . . ., sewing, stamp and coin collecting";
- "social activities" such as "community board meetings, neighborhood barbeques, [and] various social functions of community groups"; and
- "performing arts centers with the primary purpose of producing, facilitating, or presenting live performances."

FEMA Policy Guide at 14.

38. Yet for houses of worship, FEMA's policy is "simple: No churches need apply." *Trinity Lutheran Church*, 137 S. Ct. at 2024.

39. FEMA's policy provides that "[f]acilities established or primarily used for . . . religious . . . activities are not eligible." FEMA Policy Guide at 12. "Religious activities" is defined to include "worship, proselytizing, religious instruction, or fundraising activities that benefit a religious institution and not the community at large." *Id.* at 15.

40. By their very nature, houses of worship are established and primarily used for religious activities. The FEMA policies described in the previous paragraph thus amount to a categorical ban on disaster relief under the PA Program to active houses of worship. Indeed, they are a form of religious disqualification.

41. FEMA has repeatedly enforced its church exclusion policy against houses of worship. Its policy guides since at least 1998 have explicitly and consistently informed the public that houses of worship are ineligible to receive PA Program grants.

42. FEMA has also repeatedly upheld its policy against houses of worship that applied to FEMA for PA Program grants, received initial denials, and appealed the denials within FEMA's internal appeal process.

43. For example, although a Unitarian Universalist church in New Orleans that was destroyed by Hurricane Katrina had been used for "community center types of activities," FEMA found it ineligible because it believed that the building was "established for religious purposes, regardless of other secular activities held at the facility." *See* Final Decision, Community Church Unitarian Universalist (Dec. 31, 2015)    https://www.fema.gov/appeal/288379?appeal_page=analysis.    FEMA determined the church's purpose by reference to the church's articles of incorporation, bylaws, IRS tax exemption letter, business filing with the Louisiana secretary of state, and insurance policies. *Id.* Because those documents listed it as a "church" that was meant to practice "the principles of the Unitarian Universalist faith," FEMA found the church ineligible: "Consistent with RRDP 9521.1, FEMA has found ineligible, as community centers, facilities established for religious purposes, regardless of other secular activities held at the facility." *Id.* FEMA accordingly disregarded the church's "claimed secular events"—such as potluck dinners, dance

programs, and a camera club—because it perceived them as secondary to "the church's religious operations." *Id.*

44. Similarly, although Mount Nebo Baptist Church provided "literacy programs, clothing distribution, food and nutrition programs, teen retreats, health and wellness programs, and operat[ed] as a wellness center," FEMA denied aid to its Katrina-destroyed facilities because the church did not prove to FEMA's satisfaction that "over fifty percent" of its activities were non-religious. Final Decision, Mount Nebo Bible Baptist            Church            (Mar.            13,            2014), https://www.fema.gov/appeal/283775?appeal_page=analysis.    Moreover,    FEMA FEMA stated that "the policy defines 'established' as 'the purpose for which a facility was instituted,' which FEMA determines by reference to an applicant's "pre-disaster charter, bylaws, or other well-documented evidence to determine the facility's purpose." FEMA concluded that the church was established for a religious purpose because its articles of incorporation stated that its purpose was "to promote the teachings of the Gospel of Jesus Christ" and its incorporation letter from the secretary of state identified it as a "Non-Profit Religious Corporation." *Id.*

45. FEMA has issued numerous similar rulings against houses of worship. The common thread in each is that "a church does not meet FEMA's definition of an eligible PNP facility." *See* Final Decision, Middleburgh Reformed Church (Nov. 12, 2013) https://www.fema.gov/appeal/283579; *see also* Final Decision, Philadelphia Ministries https://www.fema.gov/appeal/286079 (Apr. 7, 2015) (denying aid to church because the "main feature" of the facility was a "church sanctuary" and "the facility

was established as a church," despite the fact that about a third of the facility was "dedicated for homeless shelter services"); *see also* Final Decision, Chabad of the Space Coast (June 27, 2012), https://www.fema.gov/appeal/219590?appeal_page=letter (denying aid because synagogue "appeared to be geared to the development of the Jewish faith"); *accord* Final Decision, Victory Temple Worship Center (July 8, 2003), https://www.fema.gov/appeal/218874 (ruling against church because its facilities were "not primarily used for eligible secular services").

46. As houses of worship, each of the Churches was established for religious purposes. The Churches are therefore categorically banned by the FEMA church exclusion policy from receiving disaster relief under the PA Program based solely on their religious status.

47. As houses of worship, each of the Churches uses more than 50% of its physical space more than 50% of the time for religious activities. The Churches are therefore categorically banned by the FEMA church exclusion policy from receiving disaster relief under the PA Program based solely on their religious status.

48. But for being houses of worship—that is, places established for religious purposes in which people gather to engage in religious activities—all three of the Churches' buildings would be eligible for FEMA disaster relief grants. All three Churches own their damaged buildings and are non-profits that have received I.R.C. § 501(c)(3) recognition from the IRS. All three are in counties—Harris, Liberty, and Aransas—that have been declared by the President to be a disaster area eligible for

federal funds. And all three open their buildings to the general public and provide services that, but for their religious character and purpose, are considered eligible community services by FEMA.

49. Were the Churches not religious, their prohibited "worship" services would instead be eligible as "social activities to pursue items of mutual interest"; the impermissible "religious instruction" during religious services would be permissible as "educational enrichment activity"; children's church and women's Bible study groups would qualify as a "service or activity intended to serve a specific group of individuals"; and meetings between the clergy and other church leaders would be a "community board meeting."

50. On information and belief, if the Churches were to cease all religious activity in their houses of worship—*i.e.*, if they were to convert those houses of *worship* to houses of any other activitythose buildings would become assistance-eligible.

51. The FEMA church exclusion policy thus discriminates against otherwise eligible entities simply because they are religious and "put[s them] to a choice between being a church and receiving a government benefit." *Trinity Lutheran Church*, 137 S. Ct. at 2024.

52. This discrimination is particularly irrational in the disaster relief context. As FEMA and its officials have stated in the past, "[c]hurches . . . serve an essential role in disaster recovery" and, indeed, "the local church, the local synagogue, the local faith based community, the local mosque" are often among the "real first responders" to disasters. *See* https://www.fema.gov/news-release/2011/07/08/sba-may-help-

churches-nonprofits-associations *and* https://www.fema.gov/media-library-data/1386343317410-9c998ad2f85ba25a3f93ca5fbce8df65/ThinkTank_July2013.txt (2013 speech by then-FEMA Deputy Director Rich Serino).

53. That has been just as true in the aftermath of Hurricane Harvey. Houses of worship and religious organizations are playing a key role in emergency relief and recovery efforts. *See*, *e.g.*, http://abc13.com/weather/list-of-shelters-around-houston-area/2341032/ (listing numerous Houston-area houses of worship serving as emergency shelters). President Trump rightly lauded this service recently, noting how "[h]ouses of worship have organized efforts to clean up communities and repair damaged homes." President Donald J. Trump, *A Proclamation: National Day of Prayer for the Victims of Hurricane Harvey* (Sept. 1, 2017).

54. Indeed, as it did in the aftermath of Hurricanes Rita and Ike, Hi-Way Tabernacle is currently serving as a staging center for FEMA and local government relief efforts. Despite suffering significant flooding and damage, the Tabernacle quickly got its facilities to a serviceable state and immediately began taking in evacuees. As of September 4, the church was sheltering between 60 and 70 people, with more expected. The Tabernacle's gym has been transformed into a warehouse for the county, storing and distributing food, water, hygiene products, and clothing. Over 8,000 FEMA emergency meals have been distributed from the Tabernacle's facilities. Relief workers are using the facilities to provide both medical services and haircuts to victims. The Tabernacle has been informed that governmental disaster relief helicopters may be landing on its property as well.

### IV.  The Churches' need for Emergency Work and Permanent Work

55. On August 25, 2017, the President declared that Hurricane Harvey had caused a major disaster in Texas. *See* FEMA Release No. HQ017-060, https://www.fema.gov/news-release/2017/08/25/president-donald-j-trump-approves-major-disaster-declaration-texas. And on August 27, 2017, the President amended the declaration to include the counties in which the Churches are located: Aransas, Harris, and Liberty Counties. Funding was made available in those counties "for Individual Assistance and assistance for debris removal and emergency protective measures" under the PA Program. *See* Amendment No. 1 to Notice of a Major Disaster Declaration, Internal Agency Docket No. FEMA-4332-DR, https://www.fema.gov/disaster/notices/amendment-no-1-4.

56. Hurricane Harvey severely damaged each of the Churches.

57. Rockport First Assembly of God was the first of the Churches to be hit by Hurricane Harvey. It sustained severe damage. The steeple was blown off. The roof was destroyed. All of the sanctuary's internal ceiling, lighting, and insulation were destroyed, and the sanctuary's sound system may also be a total loss. A bathroom ceiling in the church building caved in. Several trees were blown over. The church parsonage's roof suffered significant damage. The church van was destroyed, with all of its windows blown out.

58. Harvest Family Church was also extensively damaged, suffering flooding throughout its two adjacent buildings. At the flood's peak, the area and roads around the church were completely flooded and impassable, with between two to three feet

of water surrounding the church itself. Judging by the water marks and debris lines, the interior of Harvest Family's buildings experienced at least one foot of flooding throughout, with up to 20 inches in some locations, coating the inside of the church with mud and silt. Carpets, flooring, drywall, insulation, doors, furniture, and a variety of other materials were destroyed by the flooding. A large tree next to the church was felled by the flood, and other trees on the property were also damaged and may need to be removed.

59. Hi-Way Tabernacle also experienced extensive flooding, with at least three feet of standing water in the sanctuary and significant damage throughout its facilities. As with Harvest Family, the flood destroyed carpets, flooring, drywall, insulation, doors, furniture, and other materials.

60. Each of the Churches are surrounded with significant debris from the storm, including fallen trees and tree limbs.

61. Each of the Churches may be facing structural damage that requires emergency repair.

62. Without prompt emergency debris removal and repairs, people using the Churches' facilities and grounds could face an immediate threat to their health and safety as result of broken glass, sharp metal and wood, downed trees, falling limbs, mold and mildew, slick surfaces, and structures that are weakened by high winds and flooding.

63. Without prompt emergency debris removal and repairs, the Churches' facilities will suffer even more damage. For instance, the Churches need to repair the

significant moisture infiltration problem, which will otherwise cause mold and mildew issues. Also, the Churches need to repair their roofs and external structures to avoid additional water damage. Inspection and repair is also necessary to address structural weakness concerns.

64. To mitigate and repair the storm's damage, each of the Churches immediately needs Emergency Work.

65. Each has applied to FEMA for disaster aid under the PA Program. However, each remains categorically excluded from the PA Program by the FEMA church exclusion policy.

66. The Churches also need significant Permanent Work to restore their property to their pre-disaster design and function.

67. The Churches will need repairs such as new roofs, drywall, insulation, doors, paint, carpets, flooring, electrical wiring, and sound-systems.

68. The Churches also intend to apply for SBA loans to cover part of the cost of the Permanent Work that needs to be done. But it is possible that they will not be approved for an SBA loan, or that the cost of restoring their damaged facilities will exceed what an SBA loan will cover. Furthermore, the Churches cannot wait until after the SBA processes their loan applications before seeking relief from the FEMA church exclusion policy because the Churches need to make immediate plans for funding the full cost of restoring their damaged facilities.

69. Time is of the essence with respect to the subject matter of the Churches' claim. Mold will not wait for litigation process to spread through the Churches' buildings;

storm and flood debris will not stop rotting while the government processes their claims. Therefore the Churches will need relief as soon as possible in order not to suffer irreparable harm.

70.    Moreover, FEMA cost-sharing for PA grants covering emergency protective measures will be reduced from 100% to 90% after *30 days* from the President's initial disaster declaration. *See* Amendment No. 4 to Notice of a Major Disaster Declaration, Internal Agency Docket No. FEMA-4332-DR, https://www.fema.gov/disaster/notices/amendment-no-4. Thus, delay in processing the Churches' applications harms their ability to obtain available relief.

71. The Churches also have a number of time-sensitive decisions they must make right now concerning their recovery efforts.

72. For instance, First Assembly suffered such severe damage that it believes that it will have to demolish up to 5,500 square feet of its facilities, including the portions holding the church fellowship hall, kitchen, and pastoral office space. First Assembly must immediately make a number of decisions, including how much of the church building must be demolished, how that demolition should take place, and how the repairs should be documented to ensure we can have a fair opportunity to obtain FEMA relief.

73. Hi-Way Tabernacle has also been informed that flash flooding irreparably damaged the foundations of its sanctuary, and so it should be demolished as soon as possible. The sanctuary has accordingly been closed off, and the church is unable to fully move its worship services into the church gym because that space is currently

being used to house evacuees, store disaster relief supplies, provide medical services, and serve as a base of operations for FEMA to accept relief applications from others in the community. Hi-Way Tabernacle must therefore make important decisions very soon that will directly concern both its church building and its ability to resume religious services.

## CLAIM

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause
### Discrimination on the basis of religion
### (*Trinity Lutheran Church; Lukumi*)

74. The Churches incorporate by reference all preceding paragraphs.

75. But for the FEMA church exclusion policy, the Churches are otherwise eligible to receive disaster assistance under the PA Program.

76. The FEMA church exclusion policy expressly discriminates against otherwise eligible recipients like the Churches by disqualifying them from a public benefit solely because of their religious status, beliefs, and the religious nature of their activities.

77. The FEMA church exclusion policy imposes a penalty on the Churches for engaging in religious exercise.

78. The FEMA church exclusion policy places a substantial burden on the Churches' free exercise of religion.

79. The FEMA church exclusion policy chills the Churches' religious exercise.

80. The FEMA church exclusion policy causes the Churches substantial financial harm by rendering them categorically ineligible for the PA Program because of their religious status and religious activities.

81. The FEMA church exclusion policy violates the Churches' rights secured to them by the Free Exercise Clause of the First Amendment to the United States Constitution.

82. Neither the PA Program nor the FEMA church exclusion policy is neutral.

83. Neither the PA Program nor the FEMA church exclusion policy is generally applicable.

84. Further, the FEMA church exclusion policy cannot be justified by a compelling governmental interest, nor is it the least restrictive means of furthering such a governmental interest. Indeed, it does not further the governments' interests at all.

85. Absent injunctive and declaratory relief against the FEMA church exclusion policy, the Churches have been and will continue to be harmed.

## **PRAYER FOR RELIEF**

Wherefore, the Churches respectfully request that the Court:

a. Declare that the FEMA church exclusion policy and FEMA's enforcement of the church exclusion policy against the Churches violate the First Amendment of the United States Constitution;

b. Issue a preliminary injunction prohibiting Defendants from enforcing the FEMA church exclusion policy against the Churches and other houses of worship

c. Issue a permanent injunction prohibiting Defendants from enforcing the FEMA church exclusion policy against the Churches and other houses of worship;

d.  Award the Churches all applicable damages, including actual and nominal damages;

e.  Award the Churches the costs of this action and reasonable attorney's fees; and

f.  Award such other and further relief as it deems equitable and just.

## **JURY DEMAND**

The Churches request a trial by jury on all issues so triable.

Respectfully submitted this 12th day of September, 2017.

                     s/ *Eric Rassbach*
                 Eric C. Rassbach
                 (Texas Bar. No. 24013375;
                 S.D. Tex. Bar No. 872454)
                 *Attorney-in-charge*
                 Diana M. Verm (S.D. Tex. Bar. No. VA71968)
                 *Of Counsel*
                 Daniel Blomberg (S.D. Tex. Bar No. 2375161)
                 *Of Counsel*
                 Daniel Benson
                 *Of Counsel* (pro hac vice)
                 The Becket Fund for Religious Liberty
                 1200 New Hampshire Ave. NW, Ste. 700
                 Washington, DC 20036
                 Tel.:   (202) 955-0095
                 Fax:   (202) 955-0090
                 erassbach@becketlaw.org
                 dblomberg@becketlaw.org
                 dverm@becketlaw.org

                 *Counsel for Plaintiffs*