United States District Court
Southern District of Texas
**ENTERED**
December 07, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| HARVEST FAMILY CHURCH, *et al.*, § § *Plaintiffs*, § § v. § § FEDERAL EMERGENCY MANAGEMENT § AGENCY, *et al.*, § § *Defendants*. § | CIVIL ACTION H-17-2662 |

**MEMORANDUM OPINION AND ORDER**

Pending before the court are: (1) a motion for preliminary injunction (Dkt. 12) filed by plaintiffs Harvest Family Church, Hi-Way Tabernacle, and Rockport First Assembly of God (collectively, "Plaintiffs"); (2) Plaintiffs' motion for temporary restraining order and request for hearing (Dkt. 59); and (3) an unopposed motion for leave to submit an amici brief (Dkt. 56) filed by Americans United for Separation of Church and State, American Civil Liberties Union, ACLU Foundation of Texas, Inc., Anti-Defamation League, Baptist Joint Committee for Religious Liberty, and Interfaith Alliance Foundation. Having considered the motions, the responses, the replies, the various amici briefs, and the applicable law, the court is of the opinion that (1) the motion for preliminary injunction should be DENIED; (2) the motion for temporary restraining order should be DENIED; (3) the request for hearing regarding the temporary restraining order should be DENIED; and (4) the motion for leave to submit an amici brief should be GRANTED.

**I. BACKGROUND**

This is a First Amendment case. Plaintiffs, three churches, sue defendant Federal Emergency

Management Agency ("FEMA") alleging that a FEMA policy violates their rights under the Free Exercise Clause of the First Amendment. Dkt. 11 ¶¶ 74–85.

On August 25, 2017, Hurricane Harvey made landfall in Texas. Dkt. 12 at 8. Harvey caused widespread damage to countless Texans, including the three plaintiff churches. *Id.* at 8–10. Collectively, Plaintiffs suffered damage to structures such as sanctuaries, a steeple, and a fellowship hall. Dkt. 11 ¶¶ 57–59, 72–73. The flooding and damage sustained during the storm left Plaintiffs' facilities in need of repair. Dkt. 12 at 11.

The federal government immediately began to respond to the storm. *Id.* at 8. One form of relief available was under the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). *Id.* at 3. The Stafford Act authorizes the President of the United States to provide federal assistance when a natural disaster exceeds the state or local government's ability to respond. *Id.* Specifically, the Act includes a Public Assistance Program ("PA Program"), which allows for certain "private nonprofit" organizations ("PNPs") to receive disaster relief grants from FEMA. Fed. Emergency Mgmt. Agency, Public Assistance Program and Policy Guide (2017), https://www.fema.gov/media-library-data/1496435662672-d79ba9e1edb16e60b51634af00f490ae/2017_PAPPG_2.0_508_FINAL(2).pdf ("Policy Guide").

To receive disaster relief grants, a PNP must own or operate an "eligible facility." *Id.* at 12. Among other requirements, an eligible facility includes "[a] facility that provides a non-critical, but essential government service." *Id.* The Policy Guide lists eligible services, but also designates some services as ineligible. *Id.* Specifically, "[f]acilities established or primarily used for political, athletic, religious, recreational, vocational, or academic training, conferences, or similar activities are not eligible." *Id.*

When a PNP provides multiple services to its community, FEMA must determine the facility's primary use by reviewing the its "[tax] documentation," "[p]re-disaster charter, bylaws, and amendments," and "[e]vidence of longstanding, routine (day-to-day) use (e.g., a calendar of activities)." *Id.* FEMA explains:

> "Primary use" is the use for which *more* than 50 percent of the physical space in the facility is dedicated. FEMA evaluates the entire structure when determining primary use; it does not separately address individual areas, such as floors, basements, or wings. Common space, such as bathrooms, hallways, lobbies, closets, stairways, and elevators, is not included when calculating mixed-use space.
>
> If FEMA determines that 50 percent or more of physical space is dedicated to ineligible services, the entire facility is ineligible. If the facility is eligible, FEMA prorates funding based on the percentage of physical space dedicated to eligible services. The Applicant is responsible for the balance of costs to restore the facility and must restore the entire facility to receive funding for repairs to the eligible-use portions of the facility.

*Id.* at 17.

Plaintiffs concede that they use more than 50 percent of the physical space in their facilities for religious activities. Dkt. 12 at 12. However, they argue that they meet all the other funding requirements, and are thus denied funding because they are religious institutions. *Id.*

Plaintiffs ask the court to grant a preliminary injunction or temporary restraining order "relieving them from FEMA's exclusion policy" because it is unconstitutional. *Id.* at 25. Rather than responding to Plaintiffs' constitutional arguments, FEMA continuously asserts that Plaintiffs lack a concrete injury, which, in turn, strips the court of jurisdiction over the matter and negates the irreparable harm element for injunctive relief. *See* Dkts. 30, 62. Additionally, amici have filed briefs supporting and opposing Plaintiffs' motions. Dkts. 25, 29, 56.

## II.  LEGAL STANDARD

A party seeking a temporary restraining order or preliminary injunction under Rule 65 of the

Federal Rules of Civil Procedure has the burden to show four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any prejudice the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 252–53 (5th Cir. 2009); *Affiliated Prof' l Home Health Care Agency v. Shalala*, 164 F.3d 282, 285 (5th Cir. 1999). Injunctive relief, particularly at the preliminary stages of litigation, is an extraordinary remedy that requires an unequivocal showing of the need for the relief to issue. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). Thus, injunctive relief should only be granted where the movant has "clearly carried the burden of persuasion." *Bluefield Water*, 577 F.3d at 253.

### III. ANALYSIS

#### A.   Justiciability

To the extent that FEMA still asserts that this case is not justiciable, the court disagrees. FEMA responds to both motions for injunctive relief by arguing that the court lacks jurisdiction to hear the matter because Plaintiffs have not suffered a concrete injury. Dkt. 30 at 17–18; Dkt. 62 at 9. Specifically, FEMA argues that (1) Plaintiffs' applications for funding have not been denied, but are rather on hold while FEMA reviews the policy, and (2) FEMA is working on implementing a new policy that may render Plaintiffs claims moot. Dkt. 62 at 7–8.

"To achieve standing, a plaintiff must have suffered an injury in fact, and generally, 'must submit to the challenged policy' before pursuing an action to dispute it." *LaClerc v. Webb*, 419 F.3d 405, 413 (5th Cir. 2005) (citations omitted). "However, strict adherence to the standing doctrine may be excused when a policy's flat prohibition would render submission futile." *Id.* In the instant case, Plaintiffs have submitted to the challenged policy by filing applications for funding. Dkt. 12

4

at 12. Even though FEMA is in a holding period and has stopped denying applications, the policy's plain language states that a facility primarily used for religious activity cannot receive funding. Policy Guide at 12. Plaintiffs concede that they use their facilities primarily for religious activity. Dkt. 12 at 12. Undoubtedly, FEMA will deny funding to Plaintiffs under the current policy. *See LaClerc*, 419 F.3d at 414. Thus, Plaintiffs have standing.

For the same reasons, the case is also ripe. *See id.* As the policy is currently written, it would be futile to wait for FEMA to deny Plaintiffs' applications. *See id.* The question before the court—whether the denial of funds to Plaintiffs violates their constitutional rights—is purely legal and needs no further factual development. *Id.* FEMA asserts that the policy is in the process of being changed. However, any change to FEMA's policy is speculative and does not impact the challenge to the current policy. Thus, the case is ripe for adjudication.

The potential policy change also does not moot the case. As the Supreme Court has held, "voluntary cessation of a challenged practice does not moot a case unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693 (2000)). The updated policy is still speculative, and FEMA fails to make it "absolutely clear" that the allegedly wrongful behavior would not recur. Thus, FEMA's decision to change its policy does not moot the case.

**B.     Substantial Likelihood of Success on the Merits**

While Plaintiffs have the burden of persuasion on each element of injunctive relief, the court need only consider the first as Plaintiffs do not show a substantial likelihood of success on the

merits.[1]  Plaintiffs argue that they satisfy this element because FEMA's policy violates the Free Exercise Clause of the Constitution.  Dkt. 12.  The court disagrees.

Plaintiffs argue that *Trinity Lutheran* controls.  *Id.* at 22.  In *Trinity Lutheran*, a church that owned a daycare center wanted to replace its playground's surface by participating in Missouri's Scrap Tire Program.  137 S. Ct. 2012, 2017 (2017).  However, Missouri had a policy of denying grants to any applicant owned or controlled by a religious entity.  *Id.*  The church sued the state for violating its right under the Free Exercise Clause of the First Amendment.  *Id.* at 2018.  The Court held that the state's policy violated the Free Exercise Clause because it denied the church an otherwise available public benefit on account of its religious status.  *Id.* at 2025.

Plaintiffs argue that FEMA's policy has the same effect as Missouri's policy in *Trinity Lutheran*.  Dkt. 12 at 14.  They argue that FEMA denies the churches an otherwise available public benefit on account of their religious status.  *Id.*  However, *Trinity Lutheran* is distinguishable from the instant case.  *Trinity Lutheran* involved the funding of a playground, not a religious activity.  *See* 137 S. Ct. at 2024 n.3.  In fact, four justices joining the majority even acknowledged that "[the Court] does not address religious uses of funding." *Id.*

Instead, this case is similar to *Locke v. Davey*.  540 U.S. 712, 124 S. Ct. 1307 (2004).  In *Locke*, the state of Washington created a scholarship to help certain students afford post-secondary education.  *Id.* at 715.  Washington awarded a scholarship to one student, but then refused to give him the funds because he chose to pursue a devotional theology degree.  *Id.* at 717.  The student

---

[1] According to Judge Ellison's memorandum and order, FEMA needed to respond on the merits by December 1, 2017, or risk conceding Plaintiffs' likelihood of success on the merits. Dkt. 45.  While FEMA did not respond and thus conceded Plaintiffs' likelihood of success on the merits, the court is still obligated to apply the correct law to the facts before it.  *See Indus. Dev. Bd. of Section v. Fuqua Indus., Inc.*, 523 F.2d 1226, 1240 (5th Cir. 1975) ("[A] trial court has the ultimate responsibility to apply the law to the uncontested facts before it.").

argued that the denial of funds violated his rights under the Free Exercise Clause. *Id.* at 720. *Locke* held that Washington's denial of funding was constitutionally permissible. *Id.* at 724. The Court held that the student was not entitled to a presumption of unconstitutionality and that the government was not hostile toward religion for enforcing its anti-establishment goals. *See id.* at 722–24.

*Trinity Lutheran* provides important guidance on *Locke*. 137 S. Ct. at 2023. As the Court notes, the *Locke* plaintiff was not denied a scholarship because of what he was, but "because of what he proposed *to do*—use the funds to prepare for the ministry." *Id.* In *Trinity Lutheran*, on the other hand, the church planned to use the funds to resurface a playground. *Id.* The funds were not denied because of what they would be used for—a non-religious use—but because of the church's status as a religious institution. *Id.* at 2025. Thus, the policy forced the church to choose between being a church and receiving a government benefit. *Id.* at 2024.

In the instant case, FEMA's policy is closer to the scholarship in *Locke*. Plaintiffs would use the FEMA funds to rebuild facilities used primarily to promote religious activities. *See* Dkt. 11 ¶¶ 47, 57–59, 72–73. Plaintiffs need repairs to church sanctuaries, a church steeple, and a fellowship hall. *Id.* ¶¶ 57–59, 72–73. Plaintiffs even acknowledge that for at least one of the churches, the repairs are needed to resume religious services. *Id.* ¶ 73. Thus, Plaintiffs plan to use the funds for religious purposes, like the *Locke* student did. 540 U.S. at 717.

Further, FEMA's policy even distinguishes based on use, rather than status or identity. Policy Guide at 12. The policy requires a PNP's facility to provide "eligible" services. *Id.* FEMA's denial of funding is not because of Plaintiffs' status as religious institutions, but rather because they primarily use their facilities for religious activities. *Id.* Thus, the funding from FEMA would be used to further those religious activities. The policy even contemplates situations when a church would receive funding. *See id.* at 14, 171. The policy states that a community center operated by

7

a religious institution would receive funding if the facility provides eligible services. *Id.* at 14. Or, if a church operates a school and has multiple facilities, FEMA would consider each facility separately for determining the eligibility of funds. *Id.* at 171. Plaintiffs do not have to choose between being a church and receiving a government benefit because FEMA's funds are not contingent on Plaintiffs' status as churches. Rather, FEMA's funds are contingent on how Plaintiffs plan to use the funds—here, rebuilding facilities used for religious activities. Dkt. 11 ¶ 47.

As the Court recognized in *Locke* and reaffirmed in *Trinity Lutheran*, the government has a historical and justifiable interest in avoiding an establishment of religion and using public funds to support religion. *Locke*, 540 U.S. at 722; *Trinity Lutheran*, 137 S. Ct. at 2023. The difference the Court draws between *Trinity Lutheran* and *Locke* is that *Trinity Lutheran* involved playgrounds and was not an "essentially religious endeavor," like that of pursuing a religious education. *Trinity Lutheran*, 137 S. Ct. at 2023. Thus, the government had different interests in the two cases. *See id.* Here, the funding would be used to repair church facilities so that Plaintiffs could use their facilities for their primary service, which Plaintiffs admit is providing religious activities. Dkt. 11 ¶ 47.

Plaintiffs also briefly argue that FEMA's policy is unconstitutional because it is not neutral. Dkt. 12 at 16 (citing *Church of the Lukumi Babulu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S. Ct. 2217 (1993)). To the extent that Plaintiffs argue the *Lukumi* reasoning governs this dispute, the court disagrees. *Lukumi* involved criminal sanctions that sought to suppress ritualistic practices of a particular group. *See id.* at 524–28. As the Court described in *Locke*, the law targeted a specific religious practice by a specific religious group. 540 U.S. at 720. Further, *Locke* declined to extend *Lukumi* beyond "not only [*Lukumi's*] facts but [*Lukumi's*] reasoning." *Id.*

The instant case is clearly distinguishable. First, FEMA's policy does impose criminal or civil sanctions on any type of religious service or rite. *See id.* Second, FEMA's policy does not deny

funding only to entities whose facilities are primarily used for religious activities. Policy Guide at 12. Instead, facilities used for "political, athletic, religious, recreational, vocational, or academic training, conferences, or similar activities are not eligible." *Id.* Thus, *Lukumi* does not control.

For the purposes of the temporary restraining order and preliminary injunction, the court need not determine whether the policy is constitutional. *See Bluefield Water*, 577 F.3d at 252–53. Rather, the court must determine whether Plaintiffs show a substantial likelihood of success on the merits. *Id.* at 252. Because Plaintiffs' potential funding was denied based on use rather than their status as churches, *Trinity Lutheran* is distinguishable while *Locke* is controlling. Further, because Plaintiffs base their constitutional argument on *Trinity Lutheran* and *Lukumi*, they do not show a substantial likelihood of success.

## IV. CONCLUSION

Injunctive relief is an extraordinary remedy and requires Plaintiffs to make an unequivocal showing of their entitlement to relief. *Valley*, 118 F.3d at 1050. Because Plaintiffs do not show a substantial likelihood of success on the merits, the motions for preliminary injunction (Dkt. 12) and temporary restraining order (Dkt. 59) are DENIED. The motion for leave to submit an amici brief (Dkt. 56) is GRANTED. The request for hearing (Dkt. 59) on the motion for temporary restraining order is DENIED.[2]

Signed at Houston, Texas on December 7, 2017.

_____
Gray H. Miller
United States District Judge

---

[2]This case does not involve a relevant factual dispute, and thus no oral hearing is needed. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).